UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHERINE CRADDOCK and
MARSHA SNYDER, as Co-Personal
Representatives of the Estate of
STEVEN LONG, Deceased,

               Plaintiffs,                    Case No. 21-cv-12827
                                           Honorable Linda V. Parker

v.

COUNTY OF MACOMB,
WELLPATH, LLC, and JOHN DOE,

               Defendants.
_____/

## OPINION AND ORDER

This lawsuit arises from Steven Long's tragic death by suicide on October 19, 2019, while a pretrial detainee in the Macomb County Jail. In their Complaint filed initially in state court on November 17, 2021, Katherine Craddock and Marsha Snyder, Co-Personal Representatives of Mr. Long's estate (collectively "Plaintiffs"), assert various civil rights claims pursuant to 42 U.S.C. § 1983 against Defendants County of Macomb ("County"), Wellpath, LLC, and John Doe. The matter is presently before the Court on the County's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 39), which has been fully briefed (ECF Nos. 42, 45.) The Court held a motion hearing on January 24, 2024.

## II.     Standard of Review

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248).  The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor.  *Liberty Lobby*, 477 U.S. at 255.

## III.     Factual and Procedural Background

### A.     Mr. Long's Arrival at the Macomb County Jail

Mr. Long was taken into custody on October 16, 2019, after being arraigned for a probation violation in state court.  (*See* ECF No. 39-2 at PageID. 619.)  The probation violation hearing was set for October 30, and Mr. Long was given a

$10,000 cash only bond. (*Id.*) The arresting officers marked "No" in response to whether Mr. Long had any known medical problems or verbalized thoughts of suicide. (*Id*.)

After his arraignment, Mr. Long was transferred to the Macomb County Jail (hereafter "Jail"), where Corrections Deputy Backers completed the initial intake interview. (*See* ECF No. 39-3 at PageID. 621.) As part of the process, a "Suicidal Risk Questionnaire" is completed, and "No" answers were provided to the following questions:

1. Are you contemplating suicide?
2. Are you experiencing visual or auditory hallucinations?
3. Have you experienced any suicidal or self-injury behavior in the past 3 months?
4. Are you arriving at the jail directly from a hospital or psychiatric facility where you had received treatment for a suicide attempt?
5. Do you have history of recent psychiatric hospitalization occurring within 1 month prior to admission to the jail?
6. Is the inmate talking to himself/herself?
7. Is the inmate appearing confused or incoherent?
8. Is the inmate refusing to answer questions regarding mental health history?
9. Is the inmate's crime unusually shocking or heinous in nature?
10. Is the inmate a person of respect in the community or high profile?
11. Does the screening deputy believe the inmate is not being honest during assessment?

(ECF No. 39-3 at PageID. 621.) The questionnaire instructs that if any question is answered "Yes," a referral to mental health or medical staff should be immediately made "for determination of Suicide Watch Status." (*Id*.) Based on Mr. Long's

3

answers and Corrections Deputy Backers' observations, Mr. Long was assigned to normal housing.

As part of the intake process on October 16, Mr. Long also was screened by a Wellpath nurse at the Jail.  (*See* ECF No. 39-4.)  Mr. Long reported chronic post-traumatic stress disorder ("PTSD"), no current prescribed medications, non-prescribed use of Xanax and heroin (snorted) used daily and as recently as the day before, and a history of withdrawal after stopping alcohol or drug use.  (*Id*. at PageID. 623-24.)  Mr. Long answered "Yes" to whether he had a psychiatric history.  (*Id.* at PageID. 625.)  However, "No" answers were provided to the following questions:

> 1.  Arresting or Transporting officer believes subject may be a suicide risk.
> 2.  Lacks close family/friends in community.
> 3.  Worried about major problems other than legal situation (terminal illness).
> 4.  Family members or significant other has attempted or committed suicide (spouse/parent/sibling/close friend/lover).
> 5.  Has psychiatric history (psychotropic medication or treatment).
> 6.  Holds position of respect in community (professional/Public Official) and/or alleged crime is shocking in nature.  Expresses feelings of embarrassment/shame.
> 7.  Expresses thoughts about killing self.
> 8.  Has a suicide plan and/or suicide instrument in possession.
> 9.  Has previous suicide attempt.
> 10.  Expresses feelings there is nothing to look forward to in the future (feelings of helplessness and hopelessness).
> 11.  Shows signs of depression (crying or emotional flatness).
> 12.  Appears overly anxious, afraid or angry.
> 13.  Appears to feel unusually embarrassed or ashamed.

14.  Is acting and/or talking in a strange manner.  (Cannot focus attention/hearing or seeing things not there).
15.  Is apparently under the influence of alcohol or drugs.
16.  If Yes to #15, is individual incoherent or showing signs of withdrawal or mental illness?
17.  Is this individual's first arrest?
18.  Detainee's charges include: Murder, Kidnapping and/or Sexual Offense.

(*Id.* at PageID. 625-26.)  The intake form instructs that if any of the red questions or four or more of all the questions are answered "Yes," the Shift Commander must be notified, and the inmate should be referred immediately for a mental health evaluation and placed on suicide watch.  (*Id.* at PageID. 625-26.)

During the intake with the Wellpath nurse, Mr. Long also reported a history of or current use of Lexapro, a history of psychiatric hospitalization at Havenwyck two years earlier, and a history of outpatient mental health treatment a year ago. (*Id.* at PageID. 626.)  Based on the screening, and in accordance with Wellpath's policies and procedures (*see* ECF No. 39-6), the Wellpath nurse referred Mr. Long for medically supervised withdrawal and treatment and housing in the "Medical Detox unit" (*id.* at PageID. 625, 627).  The nurse also referred Mr. Long to mental health for routine—as opposed to acute—problems.[1]  (ECF No. 39-4 at PageID. 627.)  Mr. Long was prescribed medications, including Chlordiazepoxide

---

[1] Mr. Long was not evaluated by mental health in response to this referral before he committed suicide three days later.  Pursuant to Wellpath's policies and procedures, inmates given routine mental health referrals must be seen within seven days.  (ECF No. 39-13 at PageID. 705.)

(Librium), to manage his anxiety and withdrawal symptoms. (ECF No. 42-6 at PageID. 1648.)

The Jail has only two detoxification cells, which are located at the booking desk. (ECF No. 42-11 at PageID. 1768.) Mr. Long was not placed in a detoxification cell. As counsel for the County explained at the motion hearing, the Jail's detoxification cells are used only for inmates who are physically ill and unable to care for themselves while they are detoxing. Inmates assigned to detoxification protocol who are able to care for themselves can be housed in general population in cells on floor 2 in lower bunks. (ECF No. 39-7 at PageID. 683, 687; ECF No. 39-9 at PageID. 695.)

Jail deputies are not provided a list of inmates referred for detox protocol (ECF No. 42-12 at PageID 1904); however, in accordance with County policy, a memo was sent to Jail Command noting Mr. Long's referral (ECF No. 39-10). The same policies indicate that an entry will then be documented in the Command Log Book at the Booking Desk. (ECF No. 42-53 at PageID. 3189.) The County's policies provide that "inmates detoxifying from alcohol or other drugs must be closely monitored by the Medical Staff." (ECF No. 42-53 at PageID. 3189.)

### B.   Mr. Long's Post-Intake Evaluations and Behavior

In accordance with Wellpath's policies (ECF No. 39-6 at PageID 675), medical staff evaluated Mr. Long at least three times a day after his intake on

October 16 until his suicide on October 19 (*see* ECF No. 39-5).  Medical staff last visited Mr. Long at 9:15 p.m. on October 19—approximately 50 minutes before he was found hanging from his cell door.  (*Id*. at PageID 667-69; ECF No. 42-20 at PageID. 2025.)

During these evaluations, medical staff reported some nausea, vomiting, and gastrointestinal issues (i.e., diarrhea, cramping), some chills or flushing, and occasional tremors which could be felt fingertip-to-fingertip but were not observable.  (ECF No. 39-5.)  Mr. Long reported intermittent increased irritability or anxiousness.  (*Id.*)  He expressed no thoughts of self-harm or feelings of hopelessness or helplessness and reported no negative visits or phone calls with friends or family or negative outcomes during court hearings.  (*Id*.)

According to Jail inmate Steven Paszek, who was housed with Mr. Long beginning October 17, Mr. Long appeared "anxious, nervous"—unable to accept his incarceration and focused on getting out.  (ECF No. 42-19 at PageID. 1974-75.)  Inmate Paszek testified that the night before Mr. Long committed suicide, Mr. Long pressed the intercom button three to five times to get the deputies' attention because he was experiencing heartburn or chest pains.  (*Id.* at PageID. 1975.)  In response, Mr. Long received medical care or was seen by medical staff.  (*Id.* at PageID. 1994.)

Inmate Paszek also testified that Mr. Long yelled and kicked the cell door throughout the night—in bursts of several minutes at a time—particularly calling to a friend who also was housed in the Jail. (*Id.* at PageID. 1977-81.) At one point, Mr. Long told Inmate Paszek that one could do anything, including using drugs and die, if they were "right with God," and that he would be okay with it, if he overdosed. (*Id*. at PageID. 1983.) However, Inmate Paszek also testified that Mr. Long said he did not want to kill himself and never spoke about wanting to hurt himself. (ECF No. 42-20 at PageID 2026.) Inmate Paszek never heard Mr. Long tell deputies or medical staff that he was suicidal or wanted to hurt himself. (ECF No. 42-19 at PageID. 1994-95.) Inmate Paszek did not tell jail staff about Mr. Long's behavior or comments until after Mr. Long committed suicide. (*Id*. at PageID. 1997.)

Another inmate, Andrew Lee Bush, who was in line to use the phone when Mr. Long was using it, overheard Mr. Long telling someone "you'll never see me again[.] I'm going to prison, nobody cares about me." (*Id.* at PageID. 2028.) Mr. Long also made a statement that he felt his life should be over with. (*Id.*) Inmate Bush told Mr. Long afterward that Mr. Long would not be going to prison. (*Id.* at PageID. 2029.) While Mr. Long asked Inmate Bush to get him enough drugs to kill himself, Inmate Bush did not feel Mr. Long was serious and felt that he had

"sufficiently talked [Mr. Long] down." (*Id.*) Inmate Bush did not report any of this to correctional or medical staff. (*Id.*)

### C.    Mr. Long's Suicide

At around 10:05 p.m. on October 19, during med pass, Corrections Deputy Michael Antonelli observed Mr. Long's cellmate, Ronald Lowrey, outside their cell after lockdown. (ECF No. 42-20 at PageID 2025.) Inmate Lowrey indicated that he could not go into the cell because Mr. Long was using the cell's toilet. (*Id.*) Corrections Deputy Antonelli noticed a sheet of paper covering the cell-door window and used his key to manually open the door. (*Id.*) When the door opened, Mr. Long fell to the ground inside the cell door entrance. (*Id.*) Mr. Long had used what appeared to be a torn piece of a jail-issued blanket to hang himself. (*Id.*) Corrections Deputy Antonelli called for assistance and life-saving efforts were initiated. (*Id.* at PageID. 2031-32.) Mr. Long was transported by ambulance to the hospital, where he was pronounced dead the following afternoon. (*Id.* at PageID. 2033, 2041.)

Deputies had completed a security round through Mr. Long's unit at 9:35 p.m. on October 19. (*See* ECF No. 39-15 at PageID. 726.) This was 55 minutes after the last security round. (*Id.*) At the time, Jail policies required security rounds at intervals not to exceed 60 minutes. (ECF No. 39-14 at PageID. 708.)

### D.      Mr. Long's Previous Mental Health History

Plaintiffs highlight Mr. Long's psychiatric problems which began after he suffered a workplace accident resulting in severe burns covering 70% of his body in 2004.  (*See* ECF No. 42 at PageID. 1189-90.)  Mr. Long experienced PTSD, depression, anxiety, homelessness, and drug addiction after the accident.  (*Id*. at PageID. 1189.)  In June 2017, he was admitted to Havenwyck Hospital after calling 911 and telling operators he planned to hang himself.  (ECF No. 42-3 at PageID. 1631.)  Mr. Long was involuntarily admitted to another psychiatric facility in December 2018, after attempting suicide.  (ECF No. 42-4 at PageID. 1634.)

Mr. Long was incarcerated on a number of occasions prior to October 2019. While incarcerated in September 2017, he informed Wellpath staff that he attempted suicide four to five times by overdosing on heroin and opiates between 2015 and 2016.  (ECF No. 42-5 at PageID. 1641-42.)  He also informed Wellpath staff that he previously had been diagnosed with PTSD, depression, and anxiety. (*Id*.)  Although Mr. Long denied current thoughts of self harm during his September 2017 incarceration, Wellpath staff put him on a one-day suicide watch given his suicide ideations leading to his hospitalization at Havenwyck a few months earlier and his previous suicide attempts.  (*Id*.)

10

### E.    Prior Jail Suicides

Plaintiffs also highlight that Mr. Long was the twenty-first person to commit suicide at the Jail in a span of nineteen years.  According to Plaintiffs' expert, Daniela Kantorová, PsyD, the majority of these individuals, including Mr. Long, share characteristics which are common among the majority of people who die by suicide in the nation's jails and prisons: Caucasian males, between 25 and 44 years of age, who took their lives using a suffocation method within the initial weeks of incarceration.  (ECF No. 42-6 at PageID. 1651.)  Plaintiffs also state in their brief that Dr. Kantorová found that the majority of the Jail's suicide victims were undergoing detoxification.  (ECF No. 42 at PageID. 1197.)  However, this misrepresents what is contained in Dr. Kantorová's report.  (*See* ECF No. 42-6 at PageID. 1651.)

In the report, Dr. Kantorová indicates that "Wellpath conducted an analysis showing that from 2017 up to sometime after Mr. Long's death (end date not given in [Wellpath's] document), 14 suicide attempts were made and there were 6 deaths by suicide.  Out of these deaths, 70% were occurred [sic] during detoxification." (*Id.*)  In other words, from 2017 until some date after October 2019, approximately four Jail inmates committed suicide while in detox.  Four individuals does not reflect anything close to a "majority" of the 21 suicide deaths at the Jail between 2000 and 2019.  And Plaintiffs cite no other evidence supporting their assertion.

11

**F.    This Lawsuit**

As indicated, on November 17, 2021, Plaintiffs filed this lawsuit against the County, Wellpath, and a John Doe, who they describe as a County Sheriff's Deputy who allegedly failed to conduct 60-minute welfare checks in Mr. Long's unit during his incarceration.  (*See* ECF No. 1-1 at PageID. 9, ¶ 11.)  In their Complaint, Plaintiffs allege the following § 1983 claims against the County and Wellpath: (I) cruel and unusual punishment in violation of the Eighth Amendment; (II) cruel and unusual punishment in violation of the Fourteenth Amendment; (III) failure to train in violation of the Eighth and/or Fourteenth Amendments; and (IV) unlawful custom, policy, or practice in violation of the Eighth and/or Fourteenth Amendments.  Plaintiffs also assert a gross negligence claim (Count V) against the unknown Macomb County Sheriff's Deputy employed at the Jail.

A stipulated order dismissing Wellpath with prejudice was entered August 25, 2023.  (ECF No. 51.)  Plaintiffs have not identified John Doe.  As indicated, the County has moved for summary judgment.

The County first argues that Plaintiffs' claim against John Doe must be dismissed due to their failure to timely amend the Complaint to identify this individual.  The County further argues that this individual was not the proximate cause of Mr. Long's death, as required to demonstrate gross negligence under Michigan law.  Next, the County argues that it is entitled to summary judgment on

Plaintiffs' *Monell* claims because Plaintiffs have not established that any County employee committed an underlying constitutional violation. But even if a *Monell* claim can survive absent an underlying constitutional violation, the County maintains that Plaintiffs' theories for holding the County liable fail.

## IV.   Eighth or Fourteenth Amendment

It is well-settled that States are obligated under the Constitution to provide medical care to the people they incarcerate. *See Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). The source of the right depends, however, on whether the inmate is a convicted prisoner or pretrial detainee. The Eighth Amendment is the source of protection for the former; the Fourteenth Amendment protects the latter. *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 315 (6th Cir. 2023) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 398-402 (2015)); *see also Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (citations omitted) (explaining that the Eighth Amendment forbids cruel and unusual punishment through acts of deliberate indifference whereas the Fourteenth Amendment's Due Process Clause provides analogous protection to a pretrial detainee).

The parties agreed at the motion hearing that Mr. Long—who was detained pending a probation violation—was a pretrial detainee. However, neither side analyzed the issue or provided caselaw supporting this conclusion in their filings. The Court nevertheless finds authority supporting this conclusion. *See, e.g., Britt*

*v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *2-3 (6th Cir. Feb. 10, 2022) (applying Fourteenth Amendment to claim arising from inmate's death in jail after being arrested for a probation violation); *Stefan v. Olson*, 497 F. App'x 568 (6th Cir. 2012) (addressing claims brought on behalf of inmate arrested after failing to appear at his probation-violation hearing); *see also Martin v. Warren Cnty.*, 799 F. App'x 329, 334 (6th Cir. 2020) (stating that the decedent "began his pretrial detention . . . after he was arrested for a probation violation"); *see also Edmiston v. Borrego*, 75 F.4th 551, 558 (5th Cir. 2023) (individual arrested on an active warrant for parole violation considered pretrial detainee); *Russell v. Lumitap*, 31 F.4th 729, 740 (9th Cir. 2022) (categorizing as a pretrial detainee a defendant who "was arrested for a probation violation and booked" at the jail); *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1147-48 (10th Cir. 2022) (categorizing as a pretrial detainee a defendant who was arrested and jailed for probation violation); *Smith v. Franklin Cnty.*, 762 F. App'x 885, 887, 889 (11th Cir. 2019) (holding individual being held at county jail following his arrest for probation violation and driving under the influence was a pretrial detainee whose claims were governed by the Fourteenth Amendment); *Crow v. Montgomery*, 403 F.3d 598, 600 (8th Cir. 2005), overruled in part on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009) (categorizing as a pretrial detainee a defendant who "surrendered himself to the custody of the [jail] after violating his probation").

14

As Mr. Long was a pretrial detainee, the Fourteenth Amendment, rather than the Eighth Amendment, is applicable to evaluating whether his rights were violated. The Court, therefore, is dismissing Count I of Plaintiffs' Complaint, which is premised on the Eighth Amendment, and Counts III and IV, to the extent they are brought under the Eighth Amendment.

## V.    Gross Negligence - John Doe Defendant

As indicated earlier, the County seeks dismissal of Plaintiffs' claim against the unknown corrections deputy named as a defendant in their Complaint. Plaintiffs failed to respond to the County's arguments for dismissal in their response brief, and they conceded at the motion hearing that this defendant should be dismissed. This claim and defendant, therefore, are dismissed.

## VI.    *Monell* Liability – County

In Count III of their Complaint, Plaintiffs allege that the County's failure to train their employees resulted in the violation of Mr. Long's Fourteenth Amendment rights. In Count IV, Plaintiffs allege that the County's unlawful custom, policy, or practice led to the violation of Mr. Long's rights. Both counts seek to hold the County liable for Mr. Long's suicide pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

A municipality is not liable for a civil rights violation simply due to an "injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. "[A]

15

municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id*. at 691; *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 795 (6th Cir. 2005) (citations omitted).

Instead, to prevail on a § 1983 claim against a municipality, the plaintiff must show that the alleged federal violation occurred because of a municipal "policy" or "custom." *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted). "A 'custom' for purposes of *Monell* liability must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1997) (quoting *Monell*, 436 U.S. at 691). "It must reflect a course of action deliberately chosen from among various alternatives." *Id*. at 508 (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985)). Further, the policy or custom must "be the moving force behind the violation of the plaintiff's constitutional rights." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010)); *see also Monell*, 436 U.S. at 694.

16

There are four recognized avenues for a plaintiff to establish a municipality's policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

## A.  Viability of a *Monell* Claim Absent Individual Liability

The County argues that there can be no *Monell* liability without first finding an underlying constitutional violation by a municipal employee.  The Sixth Circuit certainly has made statements suggesting such a general rule.  *See, e.g., Shreve v. Franklin Cnty.*, 743 F.3d 126, 138 (6th Cir. 2014) ("Because we conclude that Reed suffered no violation of his constitutional rights, Reed's claims against Franklin County fail."); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."); *see also Heller*, 475 U.S. at 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the

use of constitutionally excessive force is quite beside the point.").  However, the

Sixth Circuit also has advised that these statements should not be read so broadly:

> Despite the fact that *Watkins* broadly states that the imposition of municipal liability is contingent on a finding of individual liability under § 1983, other cases from this circuit have indicated that the principle might have a narrower application.  Judge Cole, in a concurring opinion in *Epps v. Lauderdale County*, 45 F. App'x 332 (6th Cir. 2002), explained:
>
>> When no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality.  But a finding that the individual government actor has not committed a constitutional violation does not require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm. . . . A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy.  A municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties.  Moreover, it is possible that no one individual government actor may violate a victim's constitutional rights, but that the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

*Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018) (quoting *Epps*, 45 F.

App'x at 334-35); *see also Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th

Cir. 1993) (recognizing that "a municipality may not escape liability for a § 1983

violation merely because the officer who committed the violation is entitled to qualified immunity").

The Sixth Circuit recently addressed the issue again in *Grote v. Kenton County*, 85 F.4th 397 (2023). There, the court clearly instructed that "it is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *Id*. at 414. With respect to the Supreme Court's statement in *Heller* "that a damages award against a municipality is unwarranted 'based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm[,]'" *id*. (quoting *Heller*, 475 U.S. at 799), the Sixth Circuit pointed out that it, "as well as circuits across the country, have recognized that *Heller* does not preclude a finding of municipal liability even if no individual officer violated the Constitution where constitutional harm has nonetheless 'been inflicted upon the victim' and the municipality is responsible for the harm." *Id*. (collecting cases).

Thus, Plaintiffs are correct that the County may be found liable under § 1983 even though no claims are pending against an individual defendant for violating Mr. Long's constitutional rights, or even if the actions of a single state actor cannot be said to have been unconstitutional. Yet, Plaintiffs still must demonstrate that Mr. Long's Fourteenth Amendment rights were violated. *See North v. Cuyahoga*

19

*Cnty.*, 754 F. App'x 380, 389 (6th Cir. 2018) ("There must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails"); *see also Grote*, 85 F.4th at 414 (quoting *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002)) ("*Heller* should not be read to require a plaintiff to show more than that a governmental policy or custom was the moving force *that led to the deprivation of his constitutional rights*, the foundation for municipal liability.") (emphasis in original); *Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804, at *4 (6th Cir. Aug. 9, 2023) (citing *Andrews v. Wayne Cnty.*, 957 F.3d 714, 725 (6th Cir. 2020)) ("Our Circuit has previously determined a defendant municipality's *Monell* liability by evaluating only a non-party's actions, suggesting that a party liability is not required, *as long as the court finds a constitutional violation occurred*) (emphasis added).  In other words, Mr. Long still must have suffered a constitutional harm.  *See Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1099 (6th Cir. 2023) ("An underlying constitutional violation is the *sine qua non* of municipal liability, which requires that the constitutional violation was caused by a municipal policy or custom"); *Grote*, 85 F.4th at 414; *see also Heller*, 475 U.S. at 799 ("If a person has suffered no constitutional injury . . . the fact that [the municipality's policies or customs] might have *authorized* [unconstitutional behavior] is quite beside the point."); *see also Troutman v. Louisville Metro Dep't of Corrs.*, 979

20

F.3d 472, 489-90 (6th Cir. 2020) (quoting *Crocker ex re. Est. of Tarzwell v. Cnty. of Macomb*, 119 F. App'x 718, 724 (6th Cir. 2005)) ("[W]here there exists no constitutional violation for failure to take special precautions to prevent suicide, then there can be no constitutional violation on the part of a local government unit based on its failure to promulgate policies and to better train personnel to detect and deter jail suicides.").

Thus, the Court begins with the question of whether Mr. Long suffered such a harm. If Mr. Long's Fourteenth Amendment rights were not violated, the County is entitled to summary judgment. If Mr. Long's rights were violated, the question becomes whether a County policy or custom was the moving force.

## B.    Could a Reasonable Jury Find a Violation of Mr. Long's Fourteenth Amendment Rights

Deliberate indifference claims, whether brought by convicted prisoners under the Eighth Amendment or pretrial detainees under the Fourteenth Amendment, require satisfaction of two prongs, one objective and the second subjective. *See Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021) (citations omitted). Prior to *Brawner*, both prongs were analyzed identically regardless of whether the plaintiff's claim was brought under the Eighth or Fourteenth Amendments.

To satisfy the first prong, the plaintiff must show a sufficiently serious medical need. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

21

"*Brawner* left th[is] 'objectively serious medical need' prong untouched." *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022). *Brawner*, however, modified the second prong for claims brought by pretrial detainees under the Fourteenth Amendment. *See id.* at 315. Before *Brawner*, this prong required proof that an officer subjectively knew of facts that created a substantial risk of serious harm to the inmate and subjectively concluded that this risk existed. *Lawler v. Hardeman Cnty.*, -- F.4th --, 2024 WL 656912, at *5 (6th Cir. Feb. 16, 2024) (citing *Farmer*, 511 U.S. at 836). In *Brawner*, the Sixth Circuit "reduced *Farmer*'s subjective element from 'actual knowledge to recklessness.'" *Lawler*, 2024 WL 656912, at *6 (quoting *Helphenstine*, 60 F.4th at 316).[2] In short, post-*Brawner*, the "pretrial detainee must have a serious medical need, and the defendant must act, whether through intentional action or omission, recklessly in response to the need and the risk it presented to the detainee." *Grote*, 85 F.4th at 405 (citing *Helphenstine*, 60 F.4th 317).

---

[2] In *Lawler*, the Sixth Circuit applied the pre-*Brawner* subjective standard when analyzing whether the defendant-officers were entitled to qualified immunity because the conduct at issue occurred before *Brawner* was decided, and one prong of the qualified immunity analysis looks at whether governing caselaw "*at the time of the[] actions*" clearly established the violation. *See Lawler*, 2024 WL 656912, at *1, 4-6. Municipalities are not entitled to qualified immunity, however. *Moldowan v. City of Warren*, 578 F.3d 351, 392-93 (6th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)). When deciding the municipality's liability in *Brawner*, the Sixth Circuit applied its modified subjective prong when deciding whether the plaintiff's Fourteenth Amendment rights were violated. *See* 14 F.4th 597. Thus, the Court presumes the modified standard controls here, too.

### 1. Objectively Serious Medical Need

A serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). In jail suicide cases, courts often gloss over this prong of the deliberate-indifference test, repeating the Sixth Circuit's refrain that "[a]n inmate's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Troutman*, 979 F.3d at 482-83 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)); *see also Baker-Schneider v. Napoleon*, 769 F. App'x 189, 192 (6th Cir. 2019) (citing *Comstock*, 273 F.3d at 703-04; *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). But the Sixth Circuit repeatedly has required something more before liability attaches under § 1983: "A plaintiff meets the objective prong of the [deliberate indifference] analysis by showing that the inmate *showed suicidal tendencies* during the period of detention or that he '*posed a strong likelihood of another suicide attempt*.'" *Troutman*, 979 F.3d at 483 (emphasis added) (quoting *Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006); *Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 416 (6th Cir. 2006)); *Barber v. City of Salem*, 953 F.2d 232, 239 (6th Cir. 1992) (discussing Circuits that "require some specific knowledge of

suicidal danger before liability under section § 1983 can attach").  In other words,

"[i]t might seem straightforward that if a woman kills herself, she had some sort of

'serious medical need.'  But this first element . . . is a bit more nuanced than that."

*Campbell v. Riahi*, No. 1:20-cv-678, 2023 WL 5979211, at *4 (S.D. Ohio Sept. 13,

2023).

This is because "[s]uicide is a difficult event to predict and prevent and often

occurs without warning."  *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir.

2005).  It also is because—as the Sixth Circuit repeatedly has observed—"there is

no general constitutional right of detainees to receive suicide screenings or to be

placed in suicide safe facilities, unless the detainee has somehow demonstrated a

strong likelihood of committing suicide."[3]  *Id.* (citing *Barber*, 953 F.2d at 239-40);

*see also Andrews*, 957 F.3d at 721 (quoting *Gray*, 399 F.3d at 616); *see also*

_____

[3] After acknowledging this standard in her concurring opinion in *Grabow v. County of Macomb*, 580 F. App'x 300 (6th Cir. 2014), the Honorable Bernice Bouie Donald remarked:

> And yet the suicides keep happening.  How many times should this question come before this Court before the need for adequate suicide precautions for mentally-ill inmates becomes "clearly established law" for which officials can be held accountable?

*Id.* at 314 (Donald, J., concurring).  Plaintiffs highlight this comment in their brief. (*See* ECF No. 42 at PageID. 1221.)  Nevertheless, years after Judge Donald asked this question in *Grabow*, the Sixth Circuit has not changed the standard.  *See, e.g., Troutman*, 979 F.3d at 483. As this standard remains the rule of law under Sixth Circuit precedent, this Court is bound to follow it.

*Troutman*, 979 F.3d at 482 (quoting *Comstock*, 273 F.3d at 702; *Perez*, 466 F.3d at 423).  "The 'right' that is truly at issue is the right to have steps taken that would have prevented suicide."  *Andrews*, 957 F.3d at 721 (quoting *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989)).  But because there is no general constitutional right to receive suicide screenings or be placed in suicide-safe facilities, the Sixth Circuit has found suicide-prevention steps constitutionally required only where "it [i]s 'obvious that there [i]s a 'strong likelihood that [the] inmate w[ill] attempt suicide[.]'"  *Troutman*, 979 F.3d at 483 (quoting *Downard for Estate of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020)).

"This is a high bar[.]"  *Downard*, 968 F.3d at 601.  "[I]t is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide."  *Id*. (quoting *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013)).  It "typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm."  *Id*. (citing *Grabow v. Cnty. of Macomb*, 480 F. App'x 300, 309 (6th Cir. 2014)).

Further, there is a temporal component.  *Andrews*, 957 F.3d at 722 (citing *Linden*, 167 F. App'x at 421) ("[A] prison official's duty to recognize an inmate's risk of committing suicide has a temporal component.").  "[A] prison official must

25

be cognizant of the significant likelihood that an inmate may *imminently* seek to take his own life." *Linden*, 167 F. App'x at 421 (emphasis added) (quoting *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)). Past suicidal ideation or suicide attempts do not necessarily "make[] a current one 'clearly foreseeable[.]'" *Andrews*, 957 F.3d at 722; *Campbell*, 2023 WL 5979211, at 4 ("But merely showing Baker at one point *had* suicidal tendencies does not equate to establishing that Baker had serious medical needs constitutionally requiring Defendants' attention at the time of the events at issue."); *see also Downard*, 968 F.3d at 601 (citing *Nallani v. Wayne Cnty.*, 665 F. App'x 498, 507-08 (6th Cir. 2016)) ("Indeed, even an inmate's recent threats of suicide do not make it obvious that he poses a 'strong likelihood' of suicide if he denies feeling suicidal at intake."). As the Sixth Circuit stated in *Troutman*, the relevant focus is "the period of incarceration." 979 F.3d at 483. And because there is no "general constitutional right to receive a suicide screening or to be placed on suicide watch" unless one "manifests 'a strong likelihood of committing suicide[,]'" *Andrews*, 957 F.3d at 721 (quoting *Gray*, 399 F.3d at 616), this Court concludes that it may consider only the information known to an inmate's current jailers when assessing whether such an indication was manifested. *See Crocker*, 119 F. App'x at 723 (when assessing deliberate indifference claim, not factoring information reflecting the inmate's suicide risk in the Law Enforcement Information Network or that was

26

conveyed to the sheriff's department three months before he committed suicide, as there was no evidence that any individual defendant was aware of this information).

Here, Plaintiffs do not identify record evidence of Mr. Long's behavior, statements, or physical characteristics during his October 2019 incarceration, *which were observed or shared with jail staff*, suggesting he posed a strong likelihood of committing suicide.[4]  While Mr. Long reported or was observed to be experiencing increased irritability and anxiety during the assessments by Wellpath staff, these conditions were noted as being "minimal."  Dr. Kantorová relies on Mr. Long's history of past suicide attempts and psychiatric hospitalization in 2017 and 2018 when formulating her opinion that he was a suicide risk during his October 2019 incarceration.  (*See* ECF No. 42-6 at PageID. 1652.)  However, only Mr. Long's hospitalization at Havenwyck two years earlier was shared during his intake.[5]  (See ECF No. 39-4 at PageID. 626.)  And while Mr. Long reportedly was

---

[4] In their brief, citing Inmate Paszek's testimony and Dr. Kantorová's report, Plaintiffs state that Mr. Long "hoarded and crushed his medication, snorting it along with coffee grounds."  (ECF No. 42 at PageID. 1192.)  There is no indication that any state official was aware of this behavior.  Dr. Kantorová states in her report that "some medication potentially [was] confiscated by nursing staff."  (ECF No. 42-6 at PageID. 1652.)  However, no record evidence is identified that this in fact occurred.

[5] During his October 2019 intake, Mr. Long also reported his PTSD but not his history of depression or anxiety.  (*See* ECF No. 39-4 at PageID. 623.)  Thus, while

hospitalized at Havenwyck in September 2017, after expressing plans to commit suicide, he denied previous suicide attempt at his intake in October 2019.  (*Id.* at PageID. 625.)

Plaintiffs claim Mr. Long sought medical attention one evening but was ignored.  (ECF No. 42 at PageID. 1192.)  However, even Dr. Kantorová's report reflects that Mr. Long was seen and treated by medical staff for acid reflux in the middle of the night.  (ECF No. 42-6 at PageID. 1650.)  Plaintiffs also indicate that Mr. Long kicked the cell door and screamed for hours one evening.  (ECF No. 42 at PageID. 1192.)  There is no evidence that any Jail staff heard Mr. Long.  But even if they did, it is unclear that Mr. Long's behavior suggested he was suicidal. *See Lawler*, 2024 WL 656912, at *2 (finding no deliberate indifference where inmate "ranted and raved over . . . six and a half hours" and repeatedly kicked and hit his cell door before committing suicide).  According to Inmate Paszek, who provided this information about Mr. Long's behavior, Mr. Long was primarily yelling to a friend, to get his attention, and a couple of times screamed, "I got to get out of here.  I don't want to be here."  (ECF No. 42-19 at PageID. 1977); *see also Gray*, 399 F.3d at 614-16 (6th Cir. 2005) (upholding grant of summary

---

Plaintiffs refer to Mr. Long's history of depression and anxiety throughout their response brief, these diagnoses are not factors in assessing whether he manifested a strong likelihood of committing suicide to the state actors who encountered him during his October 2019 incarceration.

judgment when the plaintiff only demonstrated, for example that the inmate yelled, destroyed items in his cell, had chest pain, and banged on his cell).

To demonstrate that Mr. Long posed a serious risk of suicide, Plaintiffs rely primarily on the fact that he fit the profile of inmates who attempted or committed suicide in the Jail between 2000 and 2019. These characteristics include: his race (Caucasian) and age (between 24-44); that he was in the initial weeks of incarceration and undergoing detoxication; and that he was previously incarcerated, had a documented mental health history, and previously attempted suicide. (*See* ECF No. 42 at PageID. 1197-98.) But as the Sixth Circuit has stated in several § 1983 jail-suicide cases: "an inmate's membership in a high-risk group does not alone make it obvious that he will attempt suicide." *Downard*, 968 F.3d at 601 (citing *Crocker*, 119 F. App'x at 723); *see also Barber*, 953 F.2d at 23-40 ("[S]imple knowledge that the detainee fits the profile of a high suicide risk is not enough. It must be knowledge specific to that particular detainee."). Responding to this argument in *Crocker*, where the plaintiff maintained that the decedent "fit the profile of an individual who is purportedly 'most likely to commit suicide[,]'" the Sixth Circuit stated:

> Assuming that the profile is statistically valid and that [the decedent] possessed the characteristics of an individual who fits the profile, this alone is insufficient to put defendants on notice that [the decedent] himself was likely to attempt suicide. Jail officials cannot be charged with knowledge of a particular detainee's high suicide risk based solely on the fact

> that the detainee fits a profile of individuals who purportedly are more likely to commit suicide than those who do not fit the profile in all respects. This is particularly true since if past suicide attempts are factored out, the profile described by plaintiff casts a very wide net, and there is no evidence that the majority of detainees who fit the profile in those respects that would be apparent to an observer are at risk for attempting suicide.

*Crocker*, 119 F. App'x at 723). Significantly, the profile offered by the plaintiff in *Crocker* included many of the same characteristics of the profile Plaintiffs describe here: a single white male, who was intoxicated and/or a drug user, who had attempted suicide in the past. *See id.* at 721.

During the two intake screenings, Mr. Long did not express hopelessness or worries about major problems and denied current suicidal ideation. (*See id.* at PageID. 625; *see also* ECF No. 39-3 at PageID. 621.) He denied previous suicide attempt and self-injury behavior, reported or was observed to be experiencing no visual or auditory hallucinations, and did not show signs of depression or anxiousness. (ECF No. 39-3 at PageID. 621; ECF No. 39-4 at PageID 625.) He reported past or current prescription of psychiatric medication, Lexapro (an antidepressant) (ECF No. 39-4 at PageID. 626), but so too did the decedent in *Andrews* who brought her Lexapro with her when she transferred to the jail, 957 F.3d at 717. And in that case the Sixth Circuit found that the inmate "did not demonstrate a strong likelihood of committing suicide." *Id.* at 724.

In the days following intake and before he committed suicide, Wellpath staff evaluated Mr. Long three times daily.  (*See* ECF No. 39-5 at PageID. 630-69.)  It was consistently reported that Mr. Long experienced no tactile, auditory, or visual disturbances, thoughts about self-harm or feelings of hopelessness, negative interactions with friends or family, or negative outcomes in court.  (*See id.*)  As Plaintiffs point out, Mr. Long at times did report increased irritability or anxiousness or was observed to be anxious.  (*See id.*)  Notably, however, his irritability and anxiety were never ranked above a "2"—and were more consistently rated "1"—with both representing "mild" symptoms.  (*See id.*)

Mr. Long reported using drugs not prescribed by a physician and a history of withdrawal after stopping.  (ECF No. 39-4 at PageID. 624.)  But as Plaintiffs acknowledge, many of the Jail's inmates are experiencing drug and/or alcohol withdrawal.  (ECF No. 42 at PageID. 1217 (citing ECF No. 42-11 at PageID. 1731).)  In fact, according to Walter Zimny, who as of October 2020 was a Macomb County Sheriff's Office Captain and the Administrator of the Jail, about 85% of the Jail's inmates, if not a higher percentage, have substance abuse issues. (ECF No. 42-25 at PageID. 2470.)  Even setting aside the Sixth Circuit's indication that "membership in a high-risk group does not alone make it obvious that [an inmate] will attempt suicide," *Downard*, 968 F.3d at 601 (citing *Crocker*, 119 F. App'x at 723), there is no evidence that a significant percentage of those inmates

attempt or commit suicide.[6]  The *Downard* court concluded that "even when an

inmate's despondence is coupled with other stressors, like drug withdrawal, we

have found that a strong risk of suicide is not obvious if the inmate expressly

denies feeling suicidal."  *Id.* (citing *Baker-Schneider*, 769 F. App'x at 193-94)

(holding that an inmate who "cried intermittently" during intake and was

"withdrawing from heroin" did not present a "strong likelihood" of suicide because

he denied feeling suicidal); *see also Troutman*, 979 F.3d at 483 (citations omitted)

("Despondency after an arrest, even if coupled with other stressors like drug

withdrawal, does not itself lead to a 'strong likelihood' of suicide, at least if the

inmate expressly denies feeling suicidal.").

Undoubtedly, Mr. Long's drug use and risk of withdrawal were a serious

medical risk.  One of the eight cases Plaintiffs cite in their response brief to support

their assertion that the Jail "poses an alarming risk of death for its inmates"

involved an inmate who died of acute withdrawal.  *See Stojcevski v. Macomb

Cnty.*, 827 F. App'x 515 (6th Cir. 2020).  However, Mr. Long's cause of death was

not drug withdrawal.[7]  Drug withdrawal may be one factor placing an individual at

---

[6] As discussed earlier, Plaintiffs offer no evidence to support their assertion that the majority of Jail inmates who have committed, or even attempted, suicide were undergoing detoxification.

[7] The record does not support a finding that state officials were deliberately indifferent to Mr. Long's needs associated with his detoxification.  He was placed

risk of suicide but, again, the fact that Mr. Long met characteristics of a high-risk group was not enough alone to make it obvious that he presented a substantial or serious risk of suicide.

For these reasons, a reasonable juror could not find the objective prong of Plaintiffs' deliberate indifference claim satisfied.[8]  Mr. Long's Fourteenth Amendment rights, therefore, were not violated.  Thus, it is irrelevant whether a County policy or custom *could be* the moving force behind the violation of another inmate's rights.  *See Heller*, 475 U.S. at 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").  Nevertheless, in the event the Sixth Circuit disagrees with this Court's assessment of whether Mr. Long suffered a constitutional violation, the Court will address Plaintiffs' theories of liability under *Monell*.

---

on detox protocol, screened three times daily, and during those screenings did not exhibit signs of medical distress due to withdrawal.

[8] Even if Mr. Long's mental health needs, resulting in suicidal tendencies, satisfy the objective prong, for the reasons discussed, no reasonable juror could find the second prong of Plaintiffs' deliberate indifference claim satisfied.

**C.     Plaintiffs' Theories for *Monell* Liability**

In their response brief, Plaintiffs set forth five "affirmative policies,

practices, and customs attributable to Macomb County."  The Court addresses each

in turn.

> **1.     "A custom of inattention to individuals who pose a high risk
> of harm to themselves, including those who fit a profile
> associated with suicidal behavior"**

A plaintiff seeking to hold a municipality liable based on its *inaction* must

prove the following:

> (1) "a clear and persistent" pattern of unconstitutional conduct
> by municipal employees; (2) the municipality's "notice or
> constructive notice" of the unconstitutional conduct; (3) the
> municipality's "tacit approval of the unconstitutional conduct,
> such that its deliberate indifference in its failure to act can be
> said to amount to an official policy of inaction"; and (4) that
> the policy of inaction was the "moving force" of the
> constitutional deprivation, such that the plaintiff's
> constitutional injury was directly caused by the conduct of the
> municipality rather than simply by the conduct of the
> municipal employee.

*D'Ambrosio v. Marino*, 747 F.3d 378, 387-88 (6th Cir. 2014) (quoting *Doe v.*

*Claiborne Cnty.*, 103 F.3d at 508); *see also Mosier v. Evans*, 90 F.4th 541, 549

(6th Cir. 2024) (citing *Doe v. Claiborne Cnty.*, 103 F.3d at 508).  Plaintiffs do not

satisfy the first requirement.

While a number of inmates have died during their incarceration at the Jail,

and while Mr. Long may have been the twenty-first Jail inmate to have committed

suicide in a 19-year period, Plaintiffs fail to show that these deaths were

attributable to unconstitutional behavior.  Plaintiffs do not identify a single case

where a Jail or County employee or the County was found liable for an inmate's

death, much less an attempted or completed suicide.  Plaintiffs list nine cases in

their brief involving inmates who attempted or completed suicide or died of other

causes.  (*See* ECF No. 42 at PageID. 1189.)  No individual or municipality was

found liable in any of the cited cases involving suicide.[9]  *See Grabow*, 580 F.

App'x 300 (6th Cir. 2014) (finding no deliberate indifference arising from inmate's

suicide); *Crocker*, 119 F. App'x 718 (holding that no individual was deliberately

indifferent to serious needs of inmate who committed suicide); *House v. Cnty. of

Macomb*, 303 F. Supp. 2d 850 (E.D. Mich. 2004) (concluding that no individual

was deliberately indifferent to the plaintiff's risk of suicide to find liability for her

suicide attempt).  In *Plair v. County of Macomb*, No. 21-cv-12275, 2023 WL

4933932 (E.D. Mich. Aug. 2, 2023), the court found a genuine issue of material

fact with respect to the liability of a jail deputy who allegedly failed to respond

when inmates pressed the intercom and shared through the intercom that their

cellmate was committing suicide but found that no County policy or custom was

---

[9] No liability also was found in *Hubble v. County of Macomb*, No. 2:16-cv-13504, 2019 WL 1778862 (E.D. Mich. Apr. 23, 2019), although that case did not involve suicide but acute sepsis.

the moving force for the alleged constitutional violation. *Id.* at \*13-14, 18-19.
That case has yet to be tried. The remaining cases involving suicide settled before
a jury resolved the defendants' liability.[10] *See* Order Deny'g Mot. S. J., *Trombley
v. Corizon, Inc.*, No. 14-10973 (E.D. Mich. Nov. 6, 2015), ECF No. 54; Stip.
Order, *id.* (E.D. Mich. Jan. 31, 2017), ECF No. 134; Order Dismissing Case,
*Herriges v. Cnty. of Macomb*, No. 19-12193 (E.D. Mich. Aug. 25, 2021), ECF No.
175.

Moreover, as the Sixth Circuit repeatedly has stated, "there is no general
constitutional right of detainees to receive suicide screenings or to be placed in
suicide safe facilities, unless *the detainee* has somehow demonstrated a strong
likelihood of committing suicide." *Gray*, 399 F.3d at 616 (citing cases). It follows
that a municipality is not liable for a custom of inattention to inmates who fail to

---

[10] Summary judgment was denied to some of the defendants in *Stojcevski v.
Macomb County*, in a case involving an inmate who died from severe prescription-
drug withdrawal, *see* 827 F. App'x 515 (6th Cir. 2020); however, that case also
settled before the remaining defendants' liability was resolved by a jury, *see* Order
of Dismissal, *id.* (E.D. Mich. May 3, 2022), ECF No. 272. In *Milline v. Correct
Care Solutions, LLC*, No. 17-cv-12723, 2021 WL 3363398 (E.D. Mich. Aug. 3,
2021), a case involving an inmate who died of pulmonary embolism, summary
judgment was granted to all defendants but one health care provider. *Id.*. The
plaintiff and remaining defendant then settled the matter before trial. Stip. Order,
*id.* (E.D. Mich. Nov. 13, 2023), ECF No. 150.

display a suicidal risk.[11]  Plaintiffs do not maintain that the County lacks adequate

policies or procedures for inmates who display such a risk and are therefore placed

on suicide watch.[12]

_____

[11] It is Plaintiffs' position that the County had a duty to protect Mr. Long because he fit the profile of inmates who attempt or commit suicide.  They point to *Simmons v. City of Philadelphia*, 947 F.2d 1042 (3d Cir. 1991), where the court found evidence to support the plaintiff's municipal liability claim against the city for the suicide of a pretrial detainee who fit the profile of "potentially suicidal detainees."—that being, individuals who were intoxicated and detained for public intoxication.  *Id.* at 1064-65.  The profile was based on the fact that of the 20 inmates who had committed suicide in the city's lock-ups in the previous five years, 15 (70%) were intoxicated individuals detained for public intoxication.  *Id.* at 1050.  As discussed earlier, however, the Sixth Circuit has repeatedly rejected the argument that a constitutional right to protection arises simply because the individual fits a profile.  Notably, the Sixth Circuit also has repeatedly held that a constitutional right does not arise based on a potential or possibility of suicide; instead, the risk must be "clearly foreseeable" or there must be "a strong likelihood."  *Gray*, 399 F.3d at 616.

[12] Jail policy requires the screening of all inmates at intake to assess whether the inmate has special needs and/or is at risk for suicide.  (*See* ECF No. 39-22 at PageID. 775.)  Until an inmate is screened, he or she may not be placed in a cell alone.  (*Id.*)  In certain cases, inmates will also be referred for an intake assessment by mental health or medical staff (*id.*), which occurred in Mr. Long's case.  Inmates deemed to pose a suicide risk must be *inter alia* dressed in anti-suicide clothing, placed in a high observation cell, and watched continuously (for actively suicidal inmates) or at intervals of no more than 15 minutes apart (for potentially suicidal inmates).  (*See id.* at PageID. 773-774, 776.)

**2.** **"A custom and practice of inadequate classification and placement of high-risk individuals in areas of the jail unsuitable for observation"**

As an initial matter, Plaintiffs offer no evidence of any instance where a Jail inmate *who manifested a substantial risk of suicide* was inadequately classified and/or not placed in a cell where the inmate could be effectively observed. Thus, Plaintiffs do not establish a custom or practice of misclassification or unsuitable housing of suicidal inmates. Plaintiffs also do not present evidence of a custom or practice of misclassifying inmates likely to experience withdrawal. Wellpath policy sets forth requirements for identifying inmates likely to experience withdrawal and treatment for those inmates. (*See* ECF No. 39-6.) In any event, Mr. Long was classified as being likely to experience withdrawal and therefore was placed on detox protocol.

To the extent Plaintiffs maintain that the County was deliberately indifferent by failing to assign inmates on detox protocol to high observation cells, they fail to establish that this "custom or practice" constitutes deliberate indifference to the needs of those inmates.[13] Wellpath policy requires medical staff to monitor

---

[13] Wellpath policy does not require the placement of inmates who are intoxicated or undergoing withdrawal in a special detoxification cell. (*See* ECF No. 39-6 at PageID. 671-78.) The policy only provides that "[a]ny patient incarcerated under the influence of alcohol or drugs shall be housed by custody in as safe a manner as possible and kept under close observation as clinically indicated." (*Id*. at PageID. 671.) In a study conducted after Mr. Long's death, a recommendation was made to

38

inmates on detox protocol multiple times a day.  Plaintiffs fail to show that such

monitoring is insufficient to detect and treat the serious medical needs of inmates

experiencing withdrawal.  In other words, Plaintiffs do not show that it is necessary

to place inmates on detox protocol in highly-visible cells in order to treat their

serious medical needs.[14]

### 3. "A custom and practice of untimely and inadequate security rounds" and "A custom and practice of conducting predictable security rounds"

In October 2019, when Mr. Long committed suicide, Jail policy required

deputies to conduct security rounds of housing units at least every sixty minutes.

---

house all inmates in detox in a single housing location.  (*See* ECF No. 42-32 at PageID. 2586.)  The author of that study testified, however, that the recommendation was not made because it was believed to be a way to prevent suicides but to "ease . . . operations [by] having all of the detox patients located in one particular area . . . mak[ing] the assessment process just more centralized for the nurse versus having to go from one cell in one area to the next."  (ECF No. 48-4 at PageID. 4070.)

[14] Plaintiffs emphasize the failure to place Mr. Long in one of the Jail's detoxification cells when he was referred for detox protocol, arguing that Michigan law, Mich. Admin. Code R. 791.734, requires jail facilities to maintain such cells.  The regulations, however, only require special housing of "chemically impaired persons during the detoxification process *until they can care for themselves and be moved to general housing areas*."  Mich. Admin. Code. R. 791.701 (emphasis added).  There is nothing in the record suggesting that Mr. Long was unable to care for himself.  In any event, it is well-established that violations of a government policy or state statute or regulation "do[] not by [themselves] establish a constitutional violation."  *Kesterson v. Kent State Univ.*, 967 F.3d 519, 527 (6th Cir. 2020) (collecting cases); *see also Barber*, 953 F.2d at 240 ("failure to comply with a state regulation is not itself a constitutional violation").

(*See* ECF No. 42-25 at PageID. 2480.)  The same policy was in effect prior to July 2016.  However, in July 2016, the Jail mandated rounds every 30 minutes after 17 inmates committed suicide in the Jail, and an expert in suicide prevention policies recommended rounds at a maximum of 30-minute intervals.  (*See id.* at PageID. 2480; ECF No. 42-34 at PageID. 2662-63; ECF No. 42-35.)  There were no Jail suicides while the 30-minute security round policy was in effect.  (ECF No. 42-25 at PageID. 2480.)  Nevertheless, at some point prior to Mr. Long's suicide, the 60-minute policy was reinstituted.  (ECF No. 42-25 at PageID. 2480.)  Plaintiffs maintain that the 60-minute policy was a motivating force in the deprivation of Mr. Long's constitutional rights.

The same argument was made by the plaintiff and rejected by the court in *Plair*, 2023 WL 4933932, at \*17.  The district court reasoned that "Macomb could not have acted with *deliberate indifference* to [the plaintiff decedent]'s serious medical needs by failing to monitor him every thirty minutes" where, as here, the court also concluded that "no reasonable jury could find that Macomb 'acted intentionally to ignore [the decedent]'s objectively serious medical need,' nor that Macomb 'recklessly failed to act reasonably to mitigate the risk' the need posed to [the decedent]" because the decedent did not manifest a substantial risk that he would commit suicide until he actually began to choke himself.  *Id.* at \*19.  As the district court further reasoned, "[h]ad [the Macomb County Jail] received a strong

warning of [the plaintiff's decedent]'s serious medical need before he began to commit suicide, it would . . . have placed him under constant or close supervision, 'not to exceed every 15 minutes.'" *Id*. at *20 (quoting Jail policy).

Further, approximately 45 minutes before Mr. Long was found hanging from his cell door, he was assessed by Wellpath staff. (*See* ECF No. 39-5 at PageID. 666-69.) A security round was conducted in Mr. Long's unit 30 minutes before he was found. (*See* ECF No. 39-15 at PageID. 726.) Thus, the lack of a 30-minute security round requirement or the use of "predictable" security rounds cannot be found to be the moving force behind Mr. Long's suicide.

### 4. "A custom and practice of ratifying officer misconduct"

Plaintiffs maintain that Jail deputies routinely engage in misconduct for which they have received no punishment despite the County being aware of the misconduct. Plaintiffs specifically identify the following "misconduct": (i) instances where booking officers accept inmates without the arresting officers indicating whether the prisoner expressed thoughts of suicide; (ii) late rounds; and (iii) ignoring inmates' requests for medical attention. (*See* ECF No. 42 at PageID. 121211-12.) Even if such misconduct occurred and the County was aware of the misconduct, no reasonable juror could find that it was a moving force in Mr. Long's death.

First, the Jail Detention Card in Mr. Long's case was completed, with the transporting officer indicating that Mr. Long did not express suicidal thoughts. (*See* ECF No. 39-2 at PageID. 619.)  Second, while deputies conducted some late security rounds during Mr. Long's October 2019 incarceration (*see* ECF No. 42 at PageID. 1211 (citing ECF No. 42-46)), on the day he committed suicide, all of the rounds were timely between 11:06 a.m. and 10:05 p.m. (i.e., the time he was found hanging from the cell door) (*see* ECF No. 42-46 at PageID. 2894-95).  Finally, there is no evidence that Mr. Long's requests for medical attention were ignored.

### 5.    Failure to Train

Municipal liability based on a failure-to-train theory requires proof "(1) that the County's 'training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Helphenstine*, 60 F.4th at 323 (quoting *Winkler*, 893 F.3d  902).  The Sixth Circuit has been clear, however, that no municipality liability attaches under this theory unless an individual state actor has been found to have committed a constitutional violation closely related to or actually caused by inadequate training.  *See, e.g., Troutman*, 979 F.3d at 489-90 (quoting *Crocker*, 119 F. App'x at 724) ("[W]here there exists no constitutional violation for failure to take special precautions to prevent suicide, then there can be no constitutional violation on the part of a local

government unit based on its failure to promulgate policies and to better train

personnel to detect and deter jail suicides"); *Andrews*, 957 F.3d at 724 ("As the

district court recognized, [the plaintiff] cannot prevail on a failure-to-train theory

of liability against the County because no constitutional tort was committed.  No

constitutional tort was committed here because [the plaintiff's decedent] did not

demonstrate a strong likelihood of committing suicide"); *Barber*, 953 F.2d at 240;

*Estate of Harbin v. City of Detroit*, 147 F. App'x 566, 572-73 (6th Cir. 2005)

(citing *City of Canton v. Harris*, 489 U.S. 378 (1989)) ("*Harris* makes clear that a

municipality's failure to train is constitutionally irrelevant if the plaintiff failed to

demonstrate a resulting injury . . . a municipality's failure to train may be the

moving force behind a resulting injury but it cannot be an injury in and of itself.").

## VII.  Conclusion

Mr. Long's death is tragic.  However, Plaintiffs have not identified the John

Doe deputy officer whose negligence they blame in part for Mr. Long's suicide,

and the statute of limitations to do so has now passed.  Plaintiffs also fail to show

that this unknown state actor's actions were the cause of Mr. Long's injury.

As to Plaintiffs' § 1983 claims against the County, Mr. Long was a pretrial

detainee.  Thus, Plaintiffs' claims, to the extent brought under the Eighth

Amendment, must be dismissed.  As to the claims brought under the Fourteenth

Amendment, a reasonable jury could not conclude that Mr. Long's death resulted from a violation of his constitutional rights.

While Mr. Long may have shared characteristics with many of the individuals who also committed suicide while incarcerated at the Macomb County Jail, that is not enough to demonstrate a strong likelihood that he would attempt suicide. Plaintiffs fail to present evidence from which a reasonable jury could conclude that Mr. Long manifested suicidal tendencies during his October 2019 incarceration, before he took his own life. Sixth Circuit precedent establishes that, absent such a showing, Mr. Long did not have a constitutional right to receive suicide screening or be placed on suicide watch.

For that reason, and for the other reasons discussed in this decision, the County's policies and customs, which Plaintiffs rely upon to support their *Monell* claim, were not the moving force behind a violation of Mr. Long's constitutional rights. Notably, the Sixth Circuit has observed that "very few cases have upheld municipal liability for the suicide of [an inmate]." *Troutman*, 979 F.3d at 489 (quoting *Gray*, 399 F.3d at 618) (brackets omitted). Plaintiffs have not shown that a reasonable jury would find municipal liability here.

Accordingly,

**IT IS ORDERED** that the County of Macomb's Motion for Summary

Judgment (ECF No. 39) is **GRANTED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: February 26, 2024